IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| DARRYL F. MILLS, SR., | ) Civil Action No. 3:07-1477-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AUTOZONE STORES, INC., | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |
| | ) |

Plaintiff, Darryl F. Mills, Sr., ("Mills") filed this action on May 24, 2007. Defendant is

AutoZone Stores, Inc. ("AutoZone"). Mills alleges claims under Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("1981").[1]  On

February 15, 2008, AutoZone filed a motion for summary judgment. Mills filed a response on

March 28, 2008, and AutoZone filed a reply on April 7, 2008.

### FACTS

1.     AutoZone operates retail auto parts stores throughout the United States, including South

Carolina. See Defendant's Summary Judgment Memorandum at 1.

2.     Mills, a black male, began working for AutoZone in February 2003. He was initially hired

as a commercial driver for AutoZone store # 414 on St. Andrews Road in Columbia, South

Carolina. See Plaintiff's Dep. 37; Defendant's Ex. B at 1.[2]

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

[2]"Defendant's Ex. ___" refers to exhibits to Defendant's Summary Judgment Memorandum.

3.      From Mills' initial hire date until August 2007, James D'Amico ("D'Amico") served as the district manager in Mills' direct line of supervision.  Defendant's Summary Judgment Memorandum at 2; see also Plaintiff's Dep. 43; D'Amico Decl., Para. 2.

4.      On March 21, 2004, D'Amico promoted Mills to the position of commercial specialist ("CS").  Mills received a pay increase from $8.42 to $9.64 per hour.  He was tasked to assist head or lead CS Harold "Jeff" Grooms ("Grooms"), a white male, at store # 414.[3]  See Plaintiff's Dep. 43, 81-82, 107-108, 149-150; D'Amico Dep. 39-40; Defendant's Ex. B at 2.

5.      Approximately two weeks later (on April 11, 2004), Mills receive another pay increase to $10.00 per hour.  See Plaintiff's Dep. 43-44, 150-151; D'Amico Decl., Para. 3; Defendant's Ex. B at  4.

6.      In October 15, 2004, Grooms left AutoZone,[4] and Mills was store # 414's only CS.  See Defendant's Ex. E at 4 (Groom's Voluntary Termination Paperwork).

7.      After Grooms left AutoZone, D'Amico visited Store # 414, praised Mills for doing a good job, and acknowledged that Mills was good with the store's customers.  D'Amico said, however, that he, Regional Manager Brett Mullis ("Mullis"), and Regional Commercial Manager Bob Norland ("Norland") concurred that the best person for the lead CS job would

---

[3]Grooms was the head or lead CS, had worked for AutoZone since 1989, worked as a store manager for AutoZone for 14-15 years, and was paid at the rate of $13.46 per hour during the entire period that he and Mills worked together as commercial specialists.  See Defendant's Ex. E at 2; D'Amico Decl., Para. 6.

[4]Mills states that Grooms left AutoZone in August 2004 (Mills Decl., Para. 2), but has presented no evidence to dispute the termination paperwork presented by AutoZone.

be a "good old white boy" because the store had a mostly white customer base.[5] He also told

Mills that they were going to go ahead and give him a shot at the job, but Mills would be

under "serious scrutiny." Mills Decl., Paras. 2-4.

8.    On October 24, 2004, D'Amico raised Mills' salary to $10.35 per hour, and to $11.35 per

hour on December 5, 2004. Plaintiff's Dep. 44, 48-49; D'Amico Decl., Para. 3; Defendant's

Ex. B at 5, 7.

9.    AutoZone provides that after Grooms left, Mills initially remained as the only commercial

specialist in the store because declining business did not justify adding a backup commercial

specialist. Mills admits that sales were not as high as they had been. See D'Amico Decl.,

Para. 4; Plaintiff's Dep. 53-54, 65, 178.

10.   In March 2005, the commercial program at Mills' store gave a cookout for commercial

customers. Mills claims that it was traditional for the lead CS and the outside commercial

sales representative to host the affair, but a white employee in training was sent over by

management to host the cookout while Mills was forced to man the computer terminals,

preventing Mills from socializing with his customers and greeting them. Mills states that

he was told[6] that this white male was acquired from NAPA Auto Parts and would be a great

lead CS. Mills Decl., Para. 5.

---

[5]D'Amico denies making this comment, but states that he was merely relaying a comment made by a customer (Steve, a service writer for AutoZone customer Mickey's Auto) to John LaTorre (an outside sales representative) to find out if the customer had ever previously made similar comments. Upon learning that Mills overheard these comments and took them out of context, D'Amico states that he clarified with Mills that a customer (not D'Amico) made the comment and that D'Amico would not tolerate any customer treating AutoZone employees in that manner. D'Amico Dep. 24-26.

[6]Mills has not identified the person who told him this.

11.    Mills complained that he did not have enough help to service all of his accounts.  In approximately late April 2005 (the specific date has not been provided), D'Amico transferred Herman Nesbitt ("Nesbitt"), a black CS at store # 278, to store # 414 to work as a part-time CS backing up Mills.  See D'Amico Dep. 17; Plaintiff's Dep. 50, 95-96. Plaintiff's Decl., Para. 6; Plaintiff's Opposition Memorandum at 3.

12.    Mills states that Nesbitt was virtually no help and was a hindrance because Nesbitt would leave customers on telephone hold instead of assisting Mills and would not complete paperwork.  He states that Nesbitt was a full-time night shift UPS worker and did little work at AutoZone because Nesbitt was tired, slept in his car, and conducted business for his used car dealership over his cell phone.  Mills states he complained to D'Amico, who admitted that Nesbitt had been caught sleeping at store # 278.  He also claims he heard D'Amico tell Nesbitt that Nesbitt could get an extra five hours of work a week by not clocking out at lunch.  Mills Dep. 50-52; Mills Decl., Paras. 6-7.

13.    Mills states that sometime in Spring 2005 D'Amico again suggested to him that Mullis, Norland, and D'Amico still believed that a white employee would best serve in the role as head CS.  Mills Decl., Para. 8.

14.    In approximately June or August 2005,[7] one of Mills' biggest customers (Steve of Mickey's Auto) got upset about the customer service he was provided because Mills was on the phone with another customer and Nesbitt was not available to help him because Nesbitt was not

---

[7]In his declaration, Plaintiff states that this incident occurred in early June.  He also, however, states that he was transferred shortly thereafter, which appears to have been in August 2005.

working that day.  The customer called D'Amico who went to store # 414 to speak with Mills.  Plaintiff's Decl., Para. 9; Plaintiff's Dep. 56-58.

15.     On August 28, 2005, Mills was transferred to AutoZone's Irmo location, store # 892, and was reclassified as a Parts Sales Manager ("PSM") at the same pay rate per hour. Defendant's Ex. B.

16.     Before moving to store # 892, Mills asked to remain at store # 414 but his request was denied.  Mills claims he told D'Amico that D'Amico was finally going to get his "good old white boy" in the position, but D'Amico did not deny this, merely stating that he would not "go there" at that time.  Plaintiff's Decl., Para. 11.

17.     Mills states "he knows by his own knowledge" that Nesbitt did not take over the job, but that Mills was replaced as lead CS at store # 414 by Robert Taylor ("Taylor"), a white male. Mills Decl., Para. 12.

18.     AutoZone appears to contend that Mills was replaced by a black male, but has not provided the replacement's name.  See Reply at 3.  D'Amico testified that after Mills was transferred he thought that Nesbitt was there for a short time,[8] then Nesbitt left and he thought that a black male named Shawn was there for a short time before or after Nesbitt, and Taylor took the position after that.  D'Amico Dep. 32.

19.     Mills states he went from working approximately 50 hours a week (40 regular hours plus 10 hours at time and a half pay) as a lead CS to working 20-28 hours as a PSM.  He states that

---

[8]There is no indication that Nesbitt ever became a full-time CS, much less the head or lead CS at store # 414.

no additional hours were available to him until other employees resigned or were terminated. Plaintiff's Decl., Para. 10.

20.    D'Amico states that Mills was not able to take on the PSM job full-time at first because the position required availability to open and close the store and work weekends, but Mills declined to do so because of family obligations.    D'Amico Aff., Para. 11; see also Defendant's Ex. G (PSM job description).

21.    Plaintiff's attorney wrote a letter to Mullis on September 13, 2005, discussing Mills' concerns of discrimination based on race.    Mills states that Rich Thompson, AutoZone's Human Resources Manager, called him, stated he (Thompson) would not respond to the letter, and said that it was best to keep the matter in the AutoZone family.    Mills Aff., Para. 13 and Ex. A.

22.    On November 3, 2005, Mills' salary was raised to $11.72 per hour.    Defendant's Ex. B.[9]

23.    In December 2005, Mills filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the South Carolina Human Affairs Commission ("SCHAC"), alleging that he was involuntarily transferred from store # 414, reclassified as a PSM, harassed, and retaliated against and harassed because of his complaints.    Defendant's Ex. H at 1-2.

---

[9]In his affidavit, Mills states that he was making $11.75 at the time he was transferred.    Mills Aff., Para. 10.  He has, however, presented nothing to dispute AutoZone's paperwork concerning his pay.

24.     On February 1, 2007, SCHAC issued a "No Cause" finding which the EEOC adopted.

Defendant's Ex. I at 1-2.[10]

## DISCUSSION

Mills' remaining allegation is that AutoZone discriminated against him in violation of Title

VII and § 1981 by transferring/demoting him based on his race.[11]  AutoZone appears to contend that

summary judgment should be granted in its favor because Mills fails to produce direct evidence of

discrimination and he fails to establish a prima facie case of discrimination.

Title VII[12] makes it "an unlawful employment practice for an employer--(1) to fail or refuse

to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff

may proceed under ordinary principles of proof using direct or indirect evidence, or, in the absence

---

[10]Mills provides in his opposition memorandum that he has now been discriminatorily terminated from AutoZone. AutoZone claims that Mills was terminated for egregious misconduct consisting of inappropriate sexual conduct toward female customers and violation of company policies.  The parties, however, agree that Mills' termination is beyond the scope of this action.  See Plaintiff's Opposition Memorandum at 6-7, Defendant's Reply at 5.

[11]In his complaint, Mills also alleged claims concerning his salary (he alleged that he was paid less than a similarly situated white employee), a failure to promote him "properly" to the position of head or lead CS, and that white employees were treated more favorably than he was treated.  He may also have been attempting to assert a claim that he was subjected to a hostile work environment. AutoZone addressed these claims in its summary judgment memorandum.  In his opposition memorandum, Mills states that he withdraws his equal pay and retaliation claims.  Plaintiff's Opposition Memorandum at 13.  He does not address any other claims and thus appears to have abandoned any other claims (other than his discriminatory transfer/demotion claim discussed in this report).

[12]The standard for establishing claims of employment discrimination under either Title VII or §1981 is the same.  See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1285-86 (4th Cir. 1985).  Therefore, the analysis that follows, though couched in terms of Title VII, applies equally to Mills' § 1981 claims.

of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined

in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of

discrimination by offering proof that:

> (1)     he is a member of a protected class;
>
> (2)     he was qualified for his job and his job performance was satisfactory;
>
> (3)     he was subjected to an adverse employment action; and
>
> (4)     the alleged adverse action occurred under circumstances that raise a
>         reasonable inference of unlawful discrimination.

See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1286 (4th

Cir.1985); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995);

McDonnell Douglas, 411 U.S. at 802. McDonnell Douglas provides that, once a plaintiff establishes

a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory

basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer

provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then

show that the proffered reasons were not the true reasons for the employment action, but were a

pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 147 (2000).

> A.     Adverse Employment Action

"Regardless of the route a plaintiff follows in proving a Title VII action, ... the

existence of some adverse employment action is required." James v. Booz-Allen & Hamilton, Inc.,

368 F.3d 371, 375 (4th Cir. 2004). Mills alleges that his transfer was an adverse employment action

because he only received part-time hours when he was first transferred and later was given less

desirable hours than he worked in the lead CS job. AutoZone contends that Mill's transfer was not

an adverse employment action because: (1) the position to which he was transferred was an equivalent management position, (2) he retained his same hourly wage upon his transfer, (3) he continued to receive raises in pay after his transfer, (4) he continued to receive "Achieves Expectations" ratings on his performance evaluations after his transfer; and (5) any temporary cut in his hours (and thus pay) was due solely to his preference not to work nights and weekends as required by the position.

"An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment.  Conduct short of ultimate employment decisions can constitute adverse employment action." James v. Booz-Allen & Hamilton, Inc., 368 F.3d at 375-376 (internal citation, footnote, and quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  A plaintiff may establish an adverse employment action in the substantive discrimination context by showing an "ultimate employment" action that affects "hiring, granting leave, discharging, promoting, and compensating." Brockman v. Snow, 217 Fed. Appx. 201, 205 (4th Cir. 2007) (unpublished)(citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir.1981)).

A "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress

not present in the old position." Id. at 256-57; see also Taylor v. Virginia Dep't of Corrs., 177 F.Supp.2d 497, 504-05 (E.D.Va. 2001).

In the light most favorable to Plaintiff, he has, for purposes of summary judgment, shown that his transfer constituted an adverse employment action. Mills' hours changed significantly from his job as a head CS, where he worked days and what appears to have been approximately one Saturday a month, to working nights and weekends on a consistent basis. A mere change in the hours or shift work may not be enough to show an adverse employment action. See, e.g., Fitzgerald v. Ennis Bus. Forms, 2007 WL 81797, *4 (W.D.Va. Jan. 8, 2007)(unpublished)(referring to Boone and noting that "[w]hile the court is sympathetic to the difficulty of changing from a first-to a third-shift position, the inconvenience and stress of a reassignment is generally not sufficient to form the basis of a Title VII claim."). Here, however, Mills alleges not only that his hours were changed, but he was not assigned the same number of hours (20-28 hours versus 50) until there was employee attrition. The parties, although they dispute the reasons for it, do not dispute that Mills' hours were reduced after he was transferred, thus reducing his compensation.[13]

B.      Direct Evidence of Discrimination

Mills claims that he has produced sufficient direct evidence of race discrimination such that the McDonnell Douglas burden shifting mechanism is not necessary. He argues that this consists of D'Amico's comments that D'Amico, Mullis, and Norland believed that the best person for the head or lead CS position would be a good old white boy, D'Amico's comment that Mills

---

[13]Although a transfer which results in a decrease in hours and resulting pay may not be an adverse action where it is a temporary situation and the resulting loss of pay is de minimis (see Cole v. Anne Arundel County Bd. of Educ., 2006 WL 3626888, *9 (D.Md. Nov. 30, 2006)(unpublished)), it is impossible to discern from the materials provided by the parties how long Mills' reduced hours continued or how much his pay was reduced.

would get the job, but would be under serious scrutiny; and D'Amico's reiteration of the good old white boy comment. AutoZone contends that Mills has not presented direct evidence of discrimination because "stray remarks" do not constitute direct evidence. Specifically, AutoZone contends that the alleged comment by D'Amico in approximately October 2004 is not direct evidence because it does not meet the proximity requirement, as Mills was not transferred until late August 2005, more than a year after D'Amico promoted Mills to CS and nearly a year after the alleged comment by D'Amico was made and Mills was promoted to lead CS.

The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor..." Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), cert. denied, 454 U.S. 860 (1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (evidentiary standard for mixed-motive jury instruction). In establishing evidence of discrimination, derogatory remarks may constitute direct evidence, as long as the remarks were related to the employment decision in question and were not stray or isolated. Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir.1999), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

In the light most favorable to Mills, he has presented direct evidence of discrimination. The alleged comments were made by the decisionmaker (D'Amico) and concern Mills' position as a lead CS. Thus they do not appear to be "stray remarks." Although a comment made approximately a

11

year before the transfer is arguably not proximate enough to the decision to be relevant, Mills claims

that the "good old white boy" comment was "reiterated all the way up until shortly before I was

transferred to [store # 892]."  Mills Dep. 79; see also Mills Decl., Paras. 9 and 11.

AutoZone contends that Mills' allegation is "nonsensical under the same-actor inference

considering D'Amico, the individual that allegedly made the comment to Plaintiff, was also the same

individual that reviewed and approved Plaintiff's satisfactory evaluations, gave Plaintiff numerous

wage increases, promoted Plaintiff into management as a commercial specialist in the first place,

and allowed Plaintiff to remain in that position for over a year before transferring him to a different

store and into a different, but equivalent, management position."  Defendant' Reply Brief at 3.

"In cases where the hirer and firer are the same individual and the termination of

employment occurs within a relatively short time span following the hiring, a strong inference exists

that discrimination was not a determining factor for the adverse action taken by the employer."

Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991); Jiminez v. Mary Washington Coll., 57 F.3d 369,

378 (4th Cir.1995), cert. denied, 516 U.S. 944 (1995).  The Proud inference, however, loses its force

when the plaintiff presents sufficiently compelling evidence of discrimination. See, e.g., Birkbeck

v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir.1994); Proud, 945 F.2d at 798.   For example,

the inference does not apply when plaintiff presents evidence of overt discrimination in the form of

derogatory comments about the protected characteristic.  See Madel v. FCI Marketing, Inc., 116

F.3d 1247, 1253 (8th Cir.1997) (declining to apply inference where plaintiff presented evidence of

overt discrimination in form of derogatory comments about age).     Here, in the light most favorable

to Plaintiff, the Proud inference is not applicable because the decisionmaker (here D'Amico) is also

the person who allegedly made the comments that are direct evidence of discrimination.

C.      McDonnell Douglas Framework

In the light most favorable to Mills, he has also established a prima facie case under the McDonnell Douglas framework, as discussed below.  AutoZone appears to contend that Mills fails to establish a prima facie case because he was not meeting its legitimate expectations, he was not subjected to an adverse employment action, and he was cannot establish the fourth prong of his prima facie case because he was replaced by another black male.

The parties do not dispute that Mills is a member of a protected class.  Although AutoZone disputes that Mills was subjected to an adverse employment action, there is a question of fact as to whether the transfer was an adverse employment action, as Mills asserts that the transfer required greatly different hours than those for which he was hired and had worked for several years.  Additionally, Mills states that he received greatly reduced hours for a period of time after he was transferred, resulting in a pay reduction.

Although AutoZone does not directly address Plaintiff's prima facie case, the company appears to contend that Mills was not meeting its legitimate expectations based on sales and customer complaints.  Mills, however, received "Achieves Expectations" rating on his reviews.  It is undisputed that sales were already declining at the time that Grooms left (see D'Amico Decl., Para. 4); Mills had to run the commercial department without a CS for a number of months; and when he did receive an assistant CS, it was at most a part-time worker (Nesbitt, whose worth the parties appear to dispute).  The customer complaints  appear to have come from Steve at Mickey's Auto, the same person D'Amico claims was the one (instead of D'Amico) who made the "good old white boy" comment.

Mills alleges that he meets the fourth prong because he was replaced by Taylor, a white male. AutoZone appears to contend that Mills was replaced by black male before Taylor took the job. D'Amico, however, merely testified that he "thought" that Nesbitt or a black male named Shaw replaced Mills. See D'Amico Dep. 32.[14]

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 19) be denied as to Plaintiff's Title VII and § 1983 claim that AutoZone discriminatorily transferred him based on race and be granted as to the remainder of Plaintiff's claim.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

June 25, 2008
Columbia, South Carolina

---

[14]In addressing Mills' retaliation claim in its summary judgment memorandum, AutoZone contends that it has articulated legitimate, non-discriminatory reasons for Mills' transfer including that: (1) Mills told D'Amico he would consider the offer of transferring to store # 892; (2) commercial sales were down; (2) there were complaints from customers; and (4) Mills only received less hours because of his own self-imposed limitations. Even if these reasons are offered as to Mills' discriminatory transfer claim, it is unclear how an employee's statement that he would consider an offer of transfer would be a legitimate, non-discriminatory reason for the transfer. AutoZone has not asserted that Mills agreed or wanted to be transferred. As to the other reasons for the transfer, in the light most favorable to Mills, he has presented sufficient evidence that a jury could find AutoZone's reasons for the transfer to be pretextual. As noted above, sales were already down at the time Grooms left and the complaints appear to have been from the Steve at Mickey's Auto. Finally, Mills states that he did not receive additional hours until other employees were terminated or resigned.